**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

RAFAEL SOLAR,

                                        Plaintiff,

              v.                                              No. 10-CV-341
                                                                  (LEK/DRH)
C.O. R. LENNOX; NURSE NESMITH, Great
Meadow Correctional Facility; P.A.
TICHENOR, Upstate Correctional Facility;
C.O. R. LENNOX, Great Meadow
Correctional Facility; DR. THOMPSON, Great
Meadow Correctional Facility; and CAPTAIN
ROWE, Great Meadow Correctional Facility,

                                        Defendants.[1]

_____

**APPEARANCES:**                         **OF COUNSEL:**

RAFAEL SOLAR
01-A-1508
Plaintiff Pro Se
Green Haven Correctional Facility
Post Office Box 4000
Stormville, New York 12582

HON. ERIC T. SCHNEIDERMAN              WILLIAM J. McCARTHY, JR., ESQ.
New York State Attorney General        Assistant Attorney General
Attorney for Defendants
The Capitol
Albany, New York 12224-0341

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[2]

_____

          [1]Eight other defendants were previously dismissed from the action.  Dkt. No. 98 at
1.

          [2]This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

Plaintiff pro se Rafael Solar ("Solar"), an inmate in the custody of the New York State Department of Correctional and Community Services ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that the six remaining defendants, all DOCCS employees, violated his constitutional rights under the Eighth Amendment.  Second Am. Compl. (Dkt. No. 9).  Presently pending is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56.  Dkt No. 98.  Solar opposes the motion.  Dkt. Nos. 103, 105. For the following reasons it is recommended that defendants' motion be granted.

## I.  Background

The facts are related herein in the light most favorable to Solar as the non-moving party.  See Ertman v. United States, 165 F.3d 204, 206 (2d Cir.1999).

### A.  Medical Treatment

### 1.  Downstate Correctional Facility

Solar arrived at the Downstate Correctional Facility ("Downstate") infirmary unit on September 8, 2006 with an order to be housed on a "flat tier" (i.e. no stairs order) due to a recent surgery on his left foot which left him unable to ambulate without the assistance of crutches and a cast.  Dkt. No. 9-1 at 1.  On September 11, Solar was moved from the infirmary, in contravention of the flat tier order, by the order of a non-party physician as the infirmary cell was required for "a security special watch."  Dkt. No. 9-1 at 1, 22; see also Id. at 65 (explaining that the signature of the physician who approved the discharge from the infirmary was not located in Solar's chart); Dkt. No. 105-1 at 77

2

(identifying the physician that ordered Solar back to general population, though the spelling is difficult to decipher).  The following day, Solar fell down the stairs which resulted in an injury to his shoulder.  Dkt. No. 9-1 at 1; Solar Dep. (Dkt. No. 98-3 at 9-121)[3] at 7; Dkt. No. 98-3 at 144 (x-ray of shoulder showing normal impressions); Dkt. No. 9-1 at 16 (inmate injury report); Dkt. No. 103 at 7.  Solar received medical treatment from Putnam Hospital Center, was told that he might have fractured his clavicle, and instructed that further medical follow-up was required.  Solar Dep. at 7; Dkt. No. 98-3 at 149, 151; Dkt. No. 9-1 at 16.  No such follow-up occurred.  Solar Dep. at 7; Dkt. No. 9-1 at 2.

The medical treatment Solar received from an unidentified physician at the infirmary failed to include a follow-up examination to his foot or his back, both of which Solar described as painful at the time.  Dkt. No. 9-1 at 1, 17.  To treat his injuries Solar was given Ben Gay and ice, citing his faith as a reason why he would not take any pain medication.[4]  Solar Dep. at 13; Dkt. No. 9-1 at 17; Dkt. No. 103 at 7.  Subsequent to the fall, Solar was again housed in the infirmary at Downstate.  Solar Dep. at 9-10; Dkt. No. 98-3 at 147.

## 2.  Great Meadow Correctional Facility

A few days after falling, on September 16, 2006, Solar was transferred from Downstate to Great Meadow Correctional Facility ("Great Meadow").  Solar Dep. at 10-11; Dkt. No. 9-1

---

[3] Citations are to the page numbers on the deposition transcript as opposed to the page numbers in the docket headings.

[4] Eventually, the pain became too great to bear and Solar began taking pain medication to alleviate his symptoms.  Solar Dep. at 13.  The hospital advised Solar that indicated that Tylenol or ibuprofen would be sufficient to take for pain on an as needed basis.  Dkt. No. 98-3 at 145.

at 2..  When arriving at Great Meadow, Solar was using crutches and a wooden shoe,

convalescing from his recent shoulder injury and foot surgery, and not participating in

recreation as he was ordered to remain in his cell.  Solar Dep. at 11-13.  Solar was initially

seen by non-party Dr. Whalen, who allegedly took his crutches from him, but provided him

with a sling for his shoulder injury.  Solar Dep. at 15.  However, due to personality conflicts,

shortly after arriving at Great Meadow, Solar's care was transferred to defendant Dr.

Thompson.  Solar Dep. at 18-19; Dkt. No. 9-1 at 2.  Solar testified that he enjoyed Dr.

Thompson and thought that he was "a beautiful person . . . ."  Solar Dep. at 24; see also

Solar Dep. at 42 (explaining that his issues were not with Dr. Thompson's medical treatment

because he "was honest," in his explanation and treatment of Solar's back injury"), 110

(categorizing his back and knee issues as chronic, yet unchanging)[5].

Solar was evaluated by a non-party orthopaedist on January 5, 2007, for complaints of

knee pain.  Dkt. No. 9-1 at 24; Dkt. No. 105-1 at 96.  Solar contends that he was told that in

order for the orthopaedist to evaluate anything more than Solar's knee pain, for which he

was referred, Solar was required to obtain additional referrals from the facility doctors

specifically related to his back and shoulder.  Solar Dep. at 28-29; Dkt. No. 9-1 at 2.  Solar

made continuous complaints about shoulder pain in February and March, 2007.  Dkt. No.

105-1 at 97, 100.

On March 13, 2007, pursuant to the prior referral from Dr. Thompson, the orthopaedist

performed surgery on Solar's knee.  Dkt. No. 9-1 at 2, 27.  The cause of Solar's injury was

---

[5] In 2005, Solar had received radiological studies for his right knee and back which
indicated unremarkable findings.  Dkt. No. 105-1 at 13.  In 2006, Solar had a CT scan of
his leg.  Dkt. No. 9-1 at 15.  It revealed that Solar had previously been shot in the leg,
which had healed, and that he suffered from degenerative changes in his knee.  Id.

identified by Solar, as the fall down the stairs at Upstate.  Dkt. No. 9-2 at 2.  On March 23, 2007, Solar was continuing to using crutches and it was recommended that he receive a cane to assist him with ambulation as he had just had surgery on his left knee.  Dkt. No. 99-1 at 12.  Prior to that meeting, Solar had been told by Dr. Thompson that he no longer required his sling.  Solar Dep. at 30-31.  Dr. Thompson referred Solar to visit an orthopaedist for further treatment for his shoulder, but the referral was denied by DOCCS employees in Albany.  Solar Dep. at 31-37; Dkt. No. 9-1 at 42.  Solar contends that Dr. Thompson should have done more with regard to appealing Albany's denial of his referral, though Solar testified that Dr. Thompson did nothing wrong while treating his back.  Solar Dep. at 37-40.

Solar contends that while he was housed at Great Meadow, Dr. Thompson made various, repeated requests to defendant Rowe to provide Solar with accommodations for his injuries.  Rowe Decl. (Dkt. No. 98-5) ¶¶ 6-7; Solar Dep. at 87-90; Dkt. No. 9-1 at 4-5.  Solar also contends that Rowe failed to accommodate such requests.  Rowe Decl. ¶ 8; Solar Dep. at 91-96 (explaining that he told Rowe that he was not fed by third party Warren on three occasions in a one month period because the order to be fed in his cell was not being complied with and writing a letter to Rowe explaining that Solar was inappropriately moved from "the flats" to an area which required climbing four stairs despite his physical ailments).  Moreover, Solar contends that, while housed in the flats, Rowe often walked by his cell and that Solar would inform Rowe of his grievances and that Rowe would ignore him.  Rowe Decl. ¶ 9; Solar Dep. at 91-92, 95.  Rowe concedes that he receives voluminous requests from a majority of inmates, or their health care providers, for accommodations.  Rowe Decl. ¶ 12.  They were delegated to his staff members for response.  Rowe Decl. ¶ 13.

On April 5 and 6, 2007, Solar complained to Dr. Thompson about lower back and knee

pain and was told that he would be referred to see an orthopaedic surgeon regarding his

knee surgery.  Thompson Decl. (Dkt. No. 98-4) ¶ 6; Dkt. No. 99-1 at 12; Solar Dep at 25-27

(discussing the fact that he saw an orthopaedic surgeon, but only with respect to his knee

and not about the additional pain in his back or shoulder).  Additionally, Solar was given an

x-ray of his back and permitted to be fed in his cell.  Dkt. No. 99-1 at 12.  The x-ray showed

that Solar had multi-level, mild, degenerative disc disease.  Dkt. No. 99-1 at 28; Dkt. No.

103 at 10.

On May 4, 2007, Solar saw the orthopaedist about the status of Solar's knee and the

doctor concluded that Solar's pain had improved but that his resulting muscle weakness

required intervention.  Dkt. No. 9-1 at 30.  However, Solar did not wish to attend physical

therapy, preferring a knee brace and Ben-Gay ointment.  Id.  This was also recommended

by the orthopaedist to appease Solar.  Id.  On May 17, 2007, Solar continued to complain of

back pain and received another order to be fed in his cell until he was seen by the doctor.

Dkt. No. 99-1 at 11.  On May 23, Dr. Thompson saw Solar who again complained of arthritis

in his back, hips, and knees.  Thompson Decl. ¶ 7; Dkt. No. 99-1 at 11.  Solar was given a

knee brace and Ben Gay ointment and Dr. Thompson noted that Solar should be seen by

his orthopaedist again.  Thompson Decl. ¶ 7; Dkt. No. 99-1 at 11, 32.  On May 25, Solar

again complained of pain in his back, but declined ibuprofen and reported that the Ben Gay

was no longer working.  Dkt. No. 99-1 at 11.  On May 31, Solar again requested renewal of

his permit to be fed in his cell.  Dkt. No. 99-1 at 10.  On June 6, 2007, Dr. Thompson

examined Solar and provided him with a new knee brace, though Solar continued to

complain of pain in his back and knee.  Thompson Decl. ¶ 8; Dkt. No. 99-1 at 10.  Solar was

6

prescribed Ultram for his pain and given a permit to eat in his cell.  Thomspon Decl. ¶ 8; Dkt. No. 99-1 at 10, 36.

On July 6, 2007, Solar was admitted to the Great Meadow infirmary after suffering a fall. Nesmith Decl. (Dkt. No. 98-8) ¶ 6; Solar Dep. at 22, 47; Dkt. No. 103 at 8-9.  When medical staff arrived, Solar was lying on the floor, requiring assistance to shift onto the back board. Dkt. No. 99-1 at 4; Dkt. No. 103 at 9.  Solar claimed that he could not walk, though no acute distress was noted, and testified that the fall was caused by his back pain and collection of fluid in his knee.  Dkt. No. 99-1 at 4; Solar Dep. at 22; Dkt. No. 9-1 at 3; Dkt. No. 103 at 9. While in the medical unit, Nesmith examined Solar for back pain and was present when an x-ray was taken.  Nesmith Decl. ¶ 7; Dkt. No. 99-1 at 5-6; Solar Dep. at 49 (explaining that Nesmith (performed a physical examination," on Solar after his fall).  Nesmith suspected, and included a notation, that Solar was demonstrating manipulative behavior but was admitted to stay in the infirmary overnight.  Nesmith Decl. ¶ 8; Dkt. No. 99-1 at 5-6, 37-38; Solar Dep. at 43-47; Dkt. No. 103 at 9.  The x-ray showed no abnormalities in Solar's spine and the degenerative changes that were seen in May of that year were still present with no change between the two.  Dkt. No. 105-1 at 15.  Solar, who was asymptomatic, was discharged the following day by Dr. Silverberg.  Nesmith Decl. ¶ 8; Dkt. No. 99-1 at 4; Solar Dep. at 48; Dkt. No. 103 at 9; but see Dkt. No. 9-1 at 3 (alleging that Dr. Thompson forged the discharge date and actually signed the paperwork on July 10th, three days after Solar was discharged).

On July 23, 2007, Solar complained of increased pain in his knee.  Dkt. No. 99-1 at 9. Dr. Thompson saw Solar and noted there was no swelling, though he recommended that he return to his orthopaedist.  Dkt. No. 9-1 at 4; Dkt. No. 99-1 at 9.  On September 12, 2007,

medical staff sought clarification as to whether Solar was still to be fed in his cell since the prior slip ordering such was dated in early April.  Dkt. No. 99-1 at 8.  Later that week Solar's permits were renewed by Dr. Thompson and he was given orders to receive meals in his cell, live on the flats, not lift more than ten pounds, and receive a second mattress and knee brace.  Thompson Decl. ¶ 9; Dkt. No. 99-1 at 8; Dkt. No. 98-3 at 162 (medical order dated September 19, 2007).  Dr. Thompson again suggested a further examination by the orthopaedic surgeon.  Thompson Decl. ¶ 9.

Solar's complaints of knee pain continued on September 18 and October 22, 2007.  Thompson Decl. ¶¶ 10-11.  Dkt. No. 99-1 at 7.  Dr. Thompson again issued restrictions that Solar be fed in his cell, housed on the flats, given a left knee brace, made to lift no more the ten pounds, and provided with a second mattress.  Dkt. No. 99-1 at 43.  It was also noted that Solar never saw the orthopaedist for a follow up appointment, and the request was promptly resubmitted.  Thompson Decl. ¶ 11; Dkt. No. 99-1 at 7.

### 3.  Upstate Correctional Facility

On January 14, 2008, Solar was transferred to Upstate Correctional Facility ("Upstate").  Tichenor Decl. (Dkt. No. 98-7) ¶ 6; Solar Dep. at 97.  It appears that in January, while still incarcerated at Great Meadow, Solar was receiving Ultram twice a day until he departed for Upstate.  Dkt. No. 98-3 at 164.  However, Solar's last prescription for Ultram was written on July 28, 2007 and it had expired five months later on December 28, 2007.  Dkt. No. 98-3 at 167; Dkt. No. 105-1 at 50.  Thus, Upstate refused to continue giving Solar his Ultram, with which he took issue.  Solar Dep. at 99.

At Upstate, Solar was granted a temporary knee brace and lower bunk permit pending

8

review by Tichenor, a physician's assistant.  Dkt. No. 9-1 at 68.  On January 23, 2008,

Tichenor examined Solar, reviewed his file, and denied his requests for Ultram and other

various accommodations at Upstate.  Tichenor Decl. ¶ 8.  It was noted that Solar was

moving well, was in no acute distress, bent to receive his food with ease, and demonstrated

no gait disturbances.  Dkt. No. 99-1 at 2.  Tichenor concluded that Solar was suffering from

mild degenerative changes in his back and knee which could be treated with more

conservative methods such as heat and over-the-counter medication.  Dkt. No. 99-1 at 2;

Solar Dep. at 38.

    Solar continued to request medical appointments in February and March, 2008, for

complaints related to pain in his shoulder, leg, and back.  Dkt. No. 9-1 at 76-77, 83-86.

Solar was provided with ibuprofen or Tylenol on the majority of these occasions.  Id.  Om

March 5, 2008, Solar was medically stable.  Dkt. No. 105-1 at 33.  On March 11, 2008,

medical staff responded to Solar's complaints of left knee pain.  Dkt. No. 105-1 at 32.  Solar

was alert, with a mild limp, though he resisted or was uncooperative throughout the medical

examination.  Id.  Solar was diagnosed with chronic pain syndrome and radiology reports

were noted showing degenerative joint disease in his knee and shoulder.  Id.  Solar's knee

brace was taken from him.  Id.  Solar contends that he was given temporary permits for a

bottom bunk and knee brace and a prescription for pain medication and wanted his case

reviewed by a physician and not a physician's assistant as he took issue with Tichenor's

conclusions.  Solar Dep. at 101-03.  Solar was upset that Tichenor's examination was only

twenty minutes and did not automatically follow Dr. Thompson's previous recommendations

and course of treatment, which Solar liked.  Solar Dep. at 107-08; Dkt. No. 9-1 at 10.

    Solar contends that the ultimate reason for Tichenor's denials was because they were

in retaliation for grievances and complaints which had been filed.  Tichenor Decl. ¶ 10; Dkt

No. 9-1 at 11.  Solar filed a grievance on March 11, 2008 that Tichenor was removing his

knee brace in retaliation for the fact that there was "a conflict of interest between [them] . . .

." Dkt. No. 9-1 at 87.  Tichenor denies knowing of any complaints or grievances by Solar at

that time.  Tichenor Decl. ¶ 11.  Solar also contends that he was upset with the

inconsistency of treatment he received, as "every time [he would] . . . go to a defferent jail,

the doctor [would] react different[ly] to the diagnosis from the last doctor."  Solar Dep. at 41;

see also Dkt. No. 9-1 at 8.

#### 4. Subsequent Correctional Facilities

At the next facility to which Solar was transferred, he received pain medication and an

extra mattress as accommodations for his pain.  Solar Dep. at 108-09; Dkt. No. 9-1 at 12,

92.  While incarcerated at Attica Correctional Facility in December 2008, Solar was also

evaluated by an orthopaedic specialist for his complaints of joint and lower back pain.  Dkt.

No. 105-1 at 19.  During the consultation it was noted that Solar was well developed and

walked without a limp.  Id.  In March 2009, Solar underwent an MRI of his back with showed

mild to moderate disc degeneration and foraminal narrowing.  Dkt. No. 105-1 at 18.  In

September 2009, pain therapy at Attica was denied since Solar had not exhausted various

conservative therapy methods for his back and knee pain.  Dkt. No. 105-1 at 16.  A second

scan in October 2009 showed similar results to the MRI, disclosing disc space narrowing

caused by either degeneration or disc herniation in his back.  Dkt. No. 105-1 at 17.  Upon

placement in Collins Correctional Facility in February 2010, Solar was deemed to have a

handicap/chronic illness that prevented him from engaging in strenuous labor.  Dkt. No.

105-1 at 20.

### B.  Use of Force

On November 13, 2007, defendant Lennox was instructed by non-party Sgt. Rando to escort Solar to the infirmary for questioning and examination after his suspected involvement in a fight with another inmate.  Lennox Decl. (Dkt. No. 98-6) ¶ 6; <u>see also</u> Solar Dep. at 59-60 (memorandum between Rando and his superior outlining why Solar was suspected of being in an altercation and escorted to the infirmary);  Dkt. No. 9-1 at 6; Dkt. No. 98-3 at 155 (memorandum detailing the fact that inmate had a minor injury to his mouth and was acting odd and that Solar had previously been in the same area, also acting suspiciously).  This was facility protocol.  Lennox Decl. ¶ 7.  This was also the first time that Solar had met, or interacted with, defendant Lennox.  Solar Dep. (Dkt. No. 98-3 at 9-121) at 55-56.  Lennox approached Solar's cell and directed him to dress because they were going to the hospital unit.  Solar Dep. at 56-57, 68-69.  Lennox then escorted Solar to the infirmary without incident.  Solar Dep. at 57.

Upon arriving at the infirmary, Lennox instructed Solar to face the wall with his hands on the wall.  Lennox Decl. ¶ 10.  Solar contends that upon arrival, Rando began interrogating him about the fight, to which Solar responded he had no knowledge of what occurred.  Solar Dep. at 69-70.  While this was occurring, Solar contends that non-party nurse Stevens arrived and examined Solar, allowing him to take his hands off the wall and turn around so that she could examine him.  Solar Dep. at 70-71.  She noted that Solar had no injuries.  <u>Id.</u> at 71.  Solar then contends the nurse left, Rando continued to pressure Solar about his involvement in the fight, and eventually Lennox began punching Solar in the left side of his

11

face, causing him to fall to the ground and lose consciousness.  Id. at 71-74, 83-84.  After hitting the floor, Solar contends that Rando halted the assault.  Id. at 73.

Conversely, Lennox's declaration contends that while Solar was facing the wall, he repeatedly removed his hands from the wall in violation of Lennox's orders.  Lennox Decl. ¶ 11; Solar Dep. at 60.  Solar does not dispute the fact that he removed his hands from the wall.  Id. at 67.  Eventually, while engaging in this behavior, Lennox contends that Solar also turned violently towards Lennox.  Lennox Decl. ¶ 12; Solar Dep. at 60.  Lennox thought that Solar was attempting to assault him, so he found it necessary to physically restrain Solar to diffuse the situation and establish control.  Lennox Decl. ¶ 13.  Lennox placed his left hand on Solar's left shoulder and right hand on Solar's right shoulder and forced Solar, face first, into the wall, pinning him until additional personnel arrived.  Id. ¶¶ 14-15; Solar Dep. at 60. Lennox claims this use of force was reasonable and illustrated a good-faith effort to restrain the inmate and restore order.  Lennox Decl. ¶¶ 19-21.

Lennox issued a misbehavior and use of force report, both detailing the incident. Lennox Decl. ¶¶ 16-17; see also Dkt. No. 98-6 at 6 (misbehavior report), 8 (use of force report); Dkt. No. 9-1 at 44, 46.  Lennox contends Solar was examined by medical staff immediately after the use of force and it was noted that Solar "was generally uninjured with the exception of a raised area on his left forehead."  Lennox Decl. ¶ 18; see also Dkt. No. 98-6 at 9 (medical report concluding only injury was a "[r]aised area on l[ef]t forehead."), 10 (same); Dkt. No. 99-1 at 7 (health report from medical staff noting the same), 47-49.  As previously discussed, Solar contends this examination occurred prior to the assault and that the misbehavior report was false.  Dkt. No. 9-1 at 6-7.  Moreover, Solar also contends that he did receive physical injuries from the blow to the side of the head that he received from

12

Lennox, as further corroborated by subsequent medical reports in November which show that Solar had bleeding or blood clots in his eye.  Solar Dep. at 75, 83.

Solar requested medical assistance from being punched in the side of the face in conjunction with this use of force on November 14-16,18-19, 21, 23, 26-27, and 29.  Dkt. No. 9-1 at 51-55.  Solar was examined November 16, 19, 20, 21, 26 and 30.  Dkt. No. 105-1 at 4-5.  On November 16, Solar's forehead was examined and no swelling or redness was seen.  Dkt. No. 105-1 at 4.  Additionally, the pink areas of skin were identified to be spots where Solar rubbed himself trying to locate his area of injury.  Id.  No acute distress was noted.  Id.  On November 19, Solar complained of left eye swelling and had a small bruised area in the corner of his eye, though there was no swelling or redness in his eye.  Id.  A request was placed for a follow-up appointment with a physician.

By the following day, November 20, Solar continued to complain of an eye injury.  Dkt. No. 105-1 at 4.  There was still a small bruise in the corner of his eye, and now the white of his eye showed ruptured membranes.  Id.  The physician's assistant was called in to evaluate.  Id.  When Solar was again treated on November 21, it was noted that there was no change in his condition and that he had been seen by the physician's assistant the day prior.  Dkt. No. 105-1 at 5.  Solar's condition remained the same on November 26 and by November 30, Solar complained that his left eye was dry at night but was not draining.  Id.  Solar still complained of pain on the left side of his head.  Id.

Solar also contends that the medical examination, interview, and use of force were all in retaliation for the letter which Solar wrote to the Correctional Association of New York State ("CANA") on July 29, 2007.  Lennox Decl. ¶ 22.  Solar claims that Rando was upset with Solar over an unauthorized cell search of Solar's belongings which occurred October 8,

13

2007, and resulted in the disciplining of two other, unnamed, corrections officers.  Solar Dep. at 62-65; see also  Dkt. No. 98-3 at 157 (grievance filed by Solar alleging the unauthorized cell search).  Solar also testified that while Lennox did not play a part in the unauthorized cell search, based on Lennox's personal relationships with the other corrections officers, he presumed awareness.  Solar Dep. at 66-67.  Solar claims no knowledge about the altercation in which the other inmate was engaged.  Id. at 63.  Solar also cites the fact that he never received a misbehavior report for the alleged fight as proof that it did not occur.  Dkt. No. 9-1 at 7.  Lennox contends that the use of force was not in retaliation for the letter sent to CANA as he had no knowledge of the letter.  Lennox Decl. ¶¶ 23-24.

Solar was given a disciplinary hearing in conjunction with the misbehavior report and, on December 17, 2007, was found guilty.  Solar Dep. at 76; Dkt. No. 98-3 at 156.  Solar was sentenced to 120 days in solitary confinement.  Solar Dep. at 76.  Solar's disposition was reviewed and affirmed on February 1, 2008.  Dkt. No. 105-1 at 108.

## C.  Grievances

Jeffery Hale, a non-party and Assistant Director of the Inmate Grievance Program,[6] searched the database records.  Hale Decl. (Dkt. No. 98-9) ¶¶ 2-3, 7.  DOCCS is required to maintain grievances "for at least the current year plus the previous four calendar years."

---

[6]"The IGP [Inmate Grievance Program] is a three-step process that requires an inmate to: (1) file a grievance with the IGRC [Inmate Grievance Resolution Committee]; (2) appeal to the superintendent within four working days of receiving the IGRC's written response, and (3) appeal to the CORC [Central Office Review Committee] . . . ." Abney v. McGinnis, 380 F.3d 663, 668 (2d Cir.2004) (internal citations omitted).

Hale Decl. ¶ 6.  A review of Solar's filed grievances demonstrates that he

> did not appeal any grievance regarding: (i) improper medical treatment by defendants Thompson and Nesmith; (ii) excessive force imposed upon him by defendant Lennox; (iii) retaliatory acts taken again him by defendants Lennox and Tichenor; and (v) any claim against defendant Rowe for not complying with various requests for accommodations.

Id. ¶ 8; see also Dkt. No. 98-10 (print out of active and closed grievance cases from 2004 through 2011).

Solar testified that he did not remember filing any grievances in connection with the medical treatment that he received in conjunction with his July 6, 2007 fall at Great Meadow.  Solar Dep. at 23; but see Dkt. No. 9-1 at 39 (grievance related to medical care, Solar's discharge from, the infirmary on July 7, 2007), 41 (granting grievance only to extent that he was placed in observation by Nesmith on July 6th and discharge by Dr. Silverberg on July 7th).  Additionally, Solar concedes that after filing his initial grievance about the false misbehavior report he received in November 2007, he pursued his additional remedies through the court system instead of the administrative one because he did not "trust them no more [and he did not] . . . believe in the State of New York system . . . ."  Solar Dep. at 85.  Solar also testified that after filing his grievance regarding the use of force, it was returned a few weeks later claiming that it was untimely.  Id. at 78, 82-83; Dkt. No. 98-3 at 159 (grievance), 161 (response that filing on November 19, 2007 was untimely as it occurred after twenty-one days); Dkt. No. 9-1 at 56, 64 (same).

Solar specifically complained to Rowe about harassment and failure of staff to comply with his medical accommodations, but an investigation never ensued.  Solar Dep. at 81-82.  While Solar was under the impression that Rowe received all the documentation that was

required, and Rowe indicated that he would investigate Solar's complaints, nothing subsequently occurred. Id. at 82.

In July 2007, Solar filed a grievance at Great Meadow stating that he had not received medical treatment despite repeated requests for an appointment with Dr. Thompson. Dkt. No. 105-1 at 86. The grievance was granted to the extent that Solar received an appointment with Dr. Thompson four days after filing the grievance. Id. at 87. No additional appeals were filed or provided with the supporting documentation.

Additionally, Solar filed a grievance regarding his housing at Downstate which required him to walk up stairs when he was given an order to live in the flats while at Downstate. Solar Dep. at 49-50; Dkt. No. 98-3 at 148; Dkt. No. 9-1 at 23). In that case, the Superintendent's response was untimely forwarded, yet concluded that Solar had been transferred to an appropriate facility to address his medical issues. Dkt. No. 9-1 at 25-26. Furthermore, CORC issued a decision unanimously accepting the grievance, in part but denying those allegations related to inadequate medical treatment after his fall. Dkt. No. 105-1 at 81. Solar also contends that he filed a grievance in connection with the unauthorized cell search and confiscation of his property at Great Meadow on October 8, 2007. Solar Dep. at 65; Dkt. No. 98-3 at 158. An investigation ensued which concluded that there was no malfeasance by the staff. Dkt. No. 105-1 at 67.

Solar also filed a grievance regarding Upstate's refusal to provide him with Ultram upon his arrival there. Dkt. No. 98-3 at 166-70; Dkt. No. 105-1 at 34-37. This grievance was denied by the IGRC, citing Tichenor's review of the medical chart and professional opinion and concluding that Solar "will receive what is medically necessary, not as he wishes." Dkt. No. 9-1 at 73. Solar appealed the conclusion, which was later affirmed by the

superintendent and again appealed to CORC.  Dkt. No. 105-1 at 35-37.  The grievance was received by CORC, but a decision was not attached.  Dkt. No. 9-1 at 91; Dkt. No. 105-1 at 54.

Lastly, while still at Upstate, Solar filed a grievance against Tichenor for retaliating against him by removing his knee brace in March of 2008.  Dkt. No. 9-1 at 87-88; Dkt. No. 105-1 at 40, 42.  The IGRC denied the grievance, stressing that the brace was ordered temporarily, stored in Solar's personal property, and Solar was being provided pain medication to treat any residual symptoms.  Dkt. No. 9-1 at 89; Dkt. No. 105-1 at 41.  Solar's appeal was forwarded to the Superintendent for review and response.  Dkt. No. 9-1 at 89–90; Dkt. No. 105-1 at 41.  The Superintendent affirmed the denial, stating that the brace was temporary and for purposes of facilitating healing after the arthroscopic procedure in March 2007, and that the knee had healed satisfactorily and the brace was no longer needed.  Dkt. No. 105-1 at 111.  "Upon further discussion, it was discovered that the real issue is his need for a 'flats' permit when he transfers to his next facility and he wants to make sure that this [is] in place at the time of transfer."  Id.  The grievance was reinvestigated by nurse Smith and the same conclusion and reasons were cited.  Dkt. No. 105-1 at 117.  Solar also wrote to Superintendent Woods and sought a physician's review of Tichenor's medical recommendations for his plan of care.  Dkt. No. 9-1 at 78-79; Dkt. No. 105-1 at 44-45.

## II. Discussion

Solar contends that his First Amendment rights were violated when (1) he was subjected to excessive force in retaliation for a previous letter sent to CANYS and (2) his

medical ailments were not adequately treated in retaliation for filing complaints against

Tichenor and other DOCCS personnel.  Solar alleges that his Eighth Amendment rights

were violated when Thompson, Nesmith and Tichenor were deliberately indifferent to his

serious medical needs.  Solar complains that his care at each subsequent facility has

changed depending upon the individual doctor or physician's assistant who reviews his

case.  Additionally, Solar alleges that his Eighth Amendment rights were violated when

Lennox used excessive force against him.  Defendants seek dismissal because (1) Solar

has failed to exhaust his administrative remedies; (2) his constitutional claims are meritless;

(3) no evidence exists of the personal involvement of Rowe; and (4) defendants are

shielded by qualified immunity.


### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to

any material fact if supported by affidavits or other suitable evidence and the moving party

is entitled to judgment as a matter of law. The moving party has the burden to show the

absence of disputed material facts by informing the court of portions of pleadings,

depositions, and affidavits which support the motion. Fed. R. Civ. P. 56; Celotex Corp. v.

Catrett, 477 U.S. 317, 323 (1986).  Facts are material if they may affect the outcome of the

case as determined by substantive law.  Anderson v. Liberty Lobby, 477 U.S. 242, 248

(1986).  All ambiguities are resolved and all reasonable inferences are drawn in favor of the

non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine

issue for trial. The non-moving party must do more than merely show that there is some

doubt or speculation as to the true nature of the facts.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment.  Gallo v. Prudential Residential Servs. 22 F.3d 1219, 1223-24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude.  Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006); see also Sealed Plaintiff v. Sealed Defendant #1, 537 F.3d 185, 191-92 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds pro se, ... a court is obliged to construe his pleadings liberally.'" (citations omitted)).   However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. Anderson, 477 U.S. at 247-48.


**B. Failure to Exhaust**

Under 42 U.S.C. § 1997e(a), an inmate must exhaust all administrative remedies prior to bringing any suits challenging prison conditions, including federal civil rights cases. Porter v. Nussle, 534 U.S. 516, 524 (2002); see also Woodford v. Ngo, 548 U.S. 81, 83 (2006).  This exhaustion requirement applies to all prison condition claims.  Porter, 534 U.S. at 532.  "[A]ny deprivation that does not affect the fact or duration of a prisoner's overall confinement is necessarily a condition of that confinement."  Jenkins v. Haubert, 179 F.3d 19, 28 (2d Cir. 1999). The exhaustion requirement also applies even if the administrative

grievance process does not provide for all the relief requested by the inmate.  Nussle, 534 U.S. at 524.

While the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply."  Ruggiero v. County of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (citing Giano v. Goord, 380 F.3d 670, 677 (2d Cir. 2004)).  Exhaustion for an inmate in DOCCS custody is generally achieved through the IGP.  See N.Y. Comp. Codes R. & Regs. tit. 7, § 701.1, et seq.; see also note 3 supra. Allegations of staff harassment are subject to an expedited procedure whereupon the complaint is first reviewed by the Superintendent and only if it is not a bona fide claim will it be returned to the IGP for normal processing.  N.Y. Comp. Codes. R & Regs. tit. 7, § 701.8.  Included within the IGP's exhaustion requirement is the prerequisite that the inmate file an appeal with CORC and receive a response from CORC prior to filing a federal lawsuit.  Torres v. Carry, 672 F. Supp. 2d 338, 344 (S.D.N.Y. 2009); see also N.Y. Comp. Codes R. & Regs. tit. 7 § 701.5(d)(2)(ii) ("The CORC shall review each appeal, render a decision on the grievance, and transmit its decision . . . within 30 calendar days").  Disagreement with the superintendent's decision in the expedited review also requires an appeal to CORC.  N.Y. Comp. Codes. R & Regs. tit. 7, § 701.8 (g)-(h); see also Espinal v. Goord, 588 F.3d 119, 125 (2d Cir. 2009) (explaining IGP and the expedited procedure for harassment claims and its appeal mechanism through CORC).  Exhaustion must precede filing a lawsuit.  Neal v. Goord, 267 F.3d 116, 122 (2d Cir. 2001) ("Subsequent exhaustion after suit is filed therefore is insufficient.") abrogated in part on other grounds by Porter, 534 U.S. 516.

The failure to exhaust may be excused in limited circumstances.

In determining whether such an exception is applicable, a district

> court must apply a three-part test: First, the court must determine
> whether administrative remedies in fact were available to the
> prisoner.  Second, if such remedies were available, the court must
> determine whether the defendants' own actions inhibited the
> inmate's exhaustion of administrative remedies, thereby requiring
> that one or more of them be equitably estopped from raising the
> failure to exhaust as a defense.  Finally, if administrative remedies
> were available and the defendants are not estopped, the court must
> determine whether any special circumstances justify the prisoner's
> failure to comply with administrative procedural requirements.

Gayle v. Benware, 716 F. Supp. 2d 293, 298 (S.D.N.Y.2010) (internal citations omitted);

see generally Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004) (articulating above

test as the appropriate method for excusing failure to exhaust given the present state of all

Second Circuit opinions).  "Unavailability of administrative remedies . . . is an objective

[test]: that is, would a similarly situated individual of ordinary firmness have deemed them

unavailable."  Kasiem v. Switz, 756 F. Supp. 2d 570, 576-77 (S.D.N.Y. 2010) (internal

quotation marks and citations omitted).  Estoppel occurs when "an inmate reasonably

understands that pursuing a grievance through the administrative process will be futile or

impossible . . . [as evidenced by] prison officials' threats, beatings, . . . denials of grievance

forms, or by other misconduct deterring [the inmate] from fulfilling the requisite procedure."

Id. at 577 (internal quotation marks and citations omitted).  If an inmate claims estoppel and

continues to file complaints and grievances, the exception is inapplicable.  Id.  Special

circumstances exist when an inmate's failure to comply can be justified.  Id. (citations

omitted).  Justification is found "by looking at the circumstances which might understandably

lead usually uncounselled prisoners to fail to grieve in the normally required way."  Giano v.

Goord, 380 F.3d 670, 678 (2d Cir. 2004) (citations omitted).

When considering whether special circumstances exist, the inmate's actions must have

given prison officials sufficient information to place them on notice of the complaints, despite the inmate's failure to utilize formal grievance procedures, as well as give the prison time to evaluate the claims.  Macias v. Zenk, 495 F. 3d 37, 43-44 (2d Cir. 2007).  Thus exhaustion requires satisfaction of both a substantive prong, requiring prison officials to be placed on notice of the complaint, and a procedural prong, expecting inmates to present their grievances within a formally prescribed framework permitting both investigation and remediation.  Id.

Defendants contend that Solar has failed to exhaust any claims related to the (1) improper medical treatment he received by Thompson and Nesmith; (2) excessive force imposed upon him by Lennox; (3) retaliatory acts taken against him by Lennox and Tichenor; and (4) any claims against Rowe for not complying with the requested medical accommodations.

Solar filed multiple grievances for a variety of reasons, as demonstrated by his supporting papers.  Solar's testimony indicated that he did not follow the entire grievance procedure with respect to the care provided by Nesmith after his fall on July 7th or with respect to the excessive force claim with Lennox.  Solar did not state that the administrative remedies were unavailable to him or that he was unaware of how the grievance system worked.  Instead, he claimed that he did not trust the system.  However, Solar continued to file grievances throughout his incarceration.  See Dkt. No. 98-10 & 11.  Accordingly, this record refutes any claims that his previous experiences rendered the system unavailable to him, despite his claims of disbelief and a loss of faith.  Kasiem, 756 F. Supp. 2d at 577.  Moreover, Solar filed no grievances which address the alleged retaliatory conduct that Lennox displayed.  Therefore, Solar failed to exhaust his administrative remedies with

respect to these claims.

With respect to Dr. Thompson, the only grievance which was filed related to the frequency with which Solar was receiving medical treatment.  The grievance was granted in that, during the pendency of the filing Solar was seen by Dr. Thompson.  There is no record of any additional appeals.  There are also no grievances filed directly addressing the medical care provided by Dr. Thompson.  Accordingly, Solar has failed to exhaust his administrative remedies with respect to these claims.

Solar contends that he made multiple verbal complaints to Rowe, but did not file any written grievances to the IGC which were included in the moving papers.  While special circumstances may satisfy the subjective part of the test, allowing for Rowe to be put on notice that Solar had grievances about the prison conditions, Solar failed to satisfy the objective part of the test and participate in a formalized grievance program.  As Solar again, did not claim an unavailability of the system or an ignorance about using it, the verbal complaints were insufficient to exhaust his administrative remedies.

While defendants contend that Solar failed to file any grievances regarding the alleged retaliatory actions of Tichenor, Solar did so but failed to appeal the grievances to CORC. Solar filed a grievance specifically related to the alleged retaliation, which was denied by both the IGRC and the Superintendent.  The grievance was even reinvestigated by nurse Smith, though ultimately the same conclusion was reached.  While Solar engaged in the administrative program, he failed to follow it through to completion.  Exhaustion must be completed prior to bringing a federal action.  Neal, 267 F.3d at 122.

Accordingly, defendants' motion should be granted on this ground and all claims except the Eighth Amendment medical indifference cause of action against Tichenor should be

dismissed.

## C. Personal Involvement

Defendants contend that Solar has failed to establish that Rowe was personally involved in any of the alleged constitutional deprivations.  "'[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'"  Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)).  Thus, supervisory officials may not be held liable merely because they held a position of authority.  Id.; Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996).  Supervisory personnel may be considered "personally involved" if:

> (1) [T]he defendant participated directly in the alleged constitutional violation;
>
> (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;
>
> (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;
>
> (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or
>
> (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986)).[7]

---

[7]  Various courts in the Second Circuit have considered how, if at all, the decision in Ashcroft v. Iqbal, 556 U.S. 662 (2009), affected the five Colon factors which were traditionally used to determine personal involvement.  See McCarroll v. Fed. Bureau of Prisons, No. 08-CV-1343 (DNH/GHL), 2010 WL 4609379, at *4 (N.D.N.Y. Sept. 30, 2010) (noting that although the Second Circuit has not yet addressed Iqbal's impact on the five Colon factors, several district courts have done so); Kleehammer v. Monore County, 743

Solar contends that Rowe was personally involved in various alleged constitutional deprivations because (1) when Solar was housed in the flats he would personally complain to Rowe about his various problems getting his medical accommodations implemented, and (2) Solar wrote Rowe a letter about being inappropriately moved from the flats.

### 1. Missed Meals

As discussed <u>infra</u>, the Eighth Amendment requires inmates to be provided with adequate amounts of nutritious food.  In Solar's deposition testimony, he contends that he personally told Rowe about various medical accommodation issues on at least six occasions, three of which related to missed meals that were not provided to Solar while he was medically restricted to eating in his cell.  Viewing the facts in the light most favorable to Solar, such repeated, direct conversations regarding an alleged, repeating constitutional violation is sufficient to establish personal involvement.  <u>See</u> <u>Harnett v. Barr</u>, 538 F. Supp. 2d 511, 524 (N.D.N.Y. 2008) (concluding that a distinction lies between a supervisory official that is "confronted with an alleged violation that has ended or . . . is . . . a continuing violation," as with the latter the supervisory officially is deemed "personally involved if he is confronted with a situation that he can remedy directly.") (internal quotation marks and citations omitted).

Accordingly, defendants motion on this ground should be denied.

---

F. Supp. 2d 175 (W.D.N.Y. 2010) (holding that "[o]nly the first and part of the third <u>Colon</u> categories pass <u>Iqbal's</u> muster . . . ."); <u>D'Olimpio v. Crisafi</u>, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010) (holding that <u>Iqbal</u> did not eliminate <u>Colon's</u> personal involvement standard).

## 2.  Flats Permit

The fact that Rowe was the supervisor, alone, is insufficient to establish personal involvement.  <u>Wright</u>, 21 F.3d at 501.  Furthermore, "[t]he law is well established . . . that a failure to process, investigate or respond to a prisoner's grievances does not in itself give rise to a constitutional claim."  <u>Rosales v. Kikendall</u>, 677 F. Supp. 2d 643, 650 (W.D.N.Y. 2010) (internal quotation marks and citation omitted).

Rowe testified that he would delegate the responsibility of determining the numerous written requests that the office received, including those regarding medical accommodations, to his staff.  Thus, Solar's act alone of writing a letter to Rowe is insufficient to establish notice and personal involvement.  <u>Smart v. Goord</u>, 441 F. Supp. 2d 631, 643 (S.D.N.Y. 2006) ("Commissioner . . . cannot be held liable on the sole basis that he did not act in response to letters of protest sent by [plaintiff] . . . .").  Similarly, receipt of a letter, without personally investigating or acting on the letter or grievance, is insufficient to establish personal involvement.  <u>See, e.g.,</u> <u>Rivera v. Fischer</u>, 655 F. Supp. 2d 235, 238 (W.D.N.Y.2009) (citing cases); <u>Boddie v. Morgenthau</u>, 342 F. Supp. 2d 193, 203 (S.D.N.Y. 2004) ("While mere receipt of a letter from a prisoner is insufficient to establish individual liability . . . [p]ersonal involvement will be found . . . where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint.").  Furthermore, it is within the purview of a superior officer to delegate responsibility to others.  <u>See</u> <u>Vega v. Artus</u>, 610 F. Supp. 2d 185, 198 (N.D.N.Y. 2009) (finding no personal involvement where "the only involvement of the supervisory official was to refer the inmate's complaint to the appropriate staff for investigation.") (citing <u>Ortiz-Rodriquez v. N.Y. State Dep't of Corr. Servs.</u>, 491 F. Supp. 2d 342, 347 (W.D.N.Y.

2007)).

Accordingly, defendants' motion on this ground should be granted.

## D. Retaliation

Solar claims that (1) Tichenor retaliated against him by failing to provide medical care and confiscating his knee brace in response to grievances he filed against her and (2) Lennox retaliated against him by using excessive force in response to a prior letter of complaint Solar sent and disciplinary action he had imposed on two other corrections officers.  To state an actionable claim for retaliation, a plaintiff must first allege that the plaintiff's conduct was constitutionally protected and that this protected conduct was a substantial factor that caused the adverse action against plaintiff.  Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996).  "Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives."  Barclay v. New York, 477 F. Supp. 2d 546, 588 (N.D.N.Y. 2007) (citations omitted).

> There is no bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship, so courts judge the permissible inferences that can be drawn from temporal proximity in the context of particular cases. However, courts have found that six and eight month gaps between the protected conduct and adverse action were sufficient, while in other circumstances three months was considered too long.

Burton v. Lynch, 664 F. Supp. 2d 349, 367 (S.D.N.Y. 2009) (internal quotation marks and citations omitted).

However, courts must view retaliation claims with care and skepticism to avoid judicial

intrusion into matters of prison administration.  <u>Jackson v. Onondaga County</u>, 549 F. Supp. 2d 204, 214-15 (N.D.N.Y. 2008).  Therefore, conclusory allegations alone are insufficient. <u>Id.</u> at 214 (citing <u>Flaherty v. Coughlin</u>, 713 F.2d 10, 13 (2d Cir. 1983) (explaining that "claim[s] supported by specific and detailed factual allegations . . . ought usually be pursued with full discovery.")).

### 1. Tichenor

Tichenor fully evaluated Solar on January 23, 2008, shortly after arriving at Upstate.  It was at that time that Tichenor decide to alter the medication, treatment, and accommodations that Solar was receiving.  Solar began filing grievances against Tichenor specifically in March of 2008.  As this grievance was filed after her recommendations, the grievance cannot serve as motivation for her actions.  Moreover, Solar's grievance filed on or about January 15, 2008, in response to Upstate's failure to provide him with Ultram, was not directed towards Tichenor.  Moreover, Tichenor had no knowledge that the grievance was pending when she examined Solar and made her conclusions about his medical care. Accordingly, there is nothing in the record to indicate that this serves as a causal connection or motivation for her ultimate treatment decisions.

Accordingly, defendants' motion on this ground should be granted.

### 2.  Lennox

Lennox allegedly used excessive force against Solar as a response to So9lar (1) authoring of a letter of complaint to the CANY on July 29, 2007 and (2) causing two

corrections officers to be disciplined for an unauthorized cell search which occurred on October 8, 2007.  Solar has failed to establish any causal connection between the two stated events and the use of force incident.  First, Solar admits that he and Lennox had never met before the date of the use of force.  Additionally, Lennox claims, and there is nothing in the record to refute, that he was unaware of the letter of complaint that was filed three and a half months earlier.  Moreover, while closer in temporal proximity, Lennox was not involved in the unauthorized cell search the month prior, and there is nothing more than conclusory allegations in Solar's papers to establish that Lennox knew the two corrections officers that were involved and disciplined, or was even generally aware of the incident. The individual common to both the unauthorized cell search and use of force, Rando, was not named as a defendant in the present action.  Moreover, there is nothing in the record to indicate that Rando influenced Lennox in any way or informed him of any of this information prior to ordering Lennox to retrieve Solar from his cell.  Accordingly, there has been no issue of fact raised with respect to the causal connection between these events.

Therefore, defendants' motion should be granted on this ground.


### E. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment."  U.S. Const. amend. VIII.  Eighth Amendment obligations include the duty to protect prisoners from other known harms.  Farmer v. Brennan, 511 U.S. 825, 829 (1970); Matthews v. Armitage, 36 F. Supp. 2d 121, 124 (N.D.N.Y. 1999) (citations omitted).  It also includes the provision of medical care.  Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994).  The test for a § 1983 claim is twofold. First, the prisoner must show that the

condition to which he was exposed was sufficiently serious.  Farmer, 511 U.S. at 834.

Second, the prisoner must show that the prison official demonstrated deliberate indifference

by having knowledge of the risk and failing to take measures to avoid the harm.  Id.

"[P]rison officials who actually knew of a substantial risk to inmate health or safety may be

found free from liability if they responded reasonably to the risk, even if the harm ultimately

was not averted."  Id. at 844.


### 1. Excessive Force

Inmates enjoy an Eighth Amendment protection against the use of excessive force and

may recover damages for its violation under § 1983.  Hudson v. McMillian, 503 U.S. 1, 9-10

(1992).  The Eighth Amendment's prohibition against cruel and unusual punishment

precludes the "unnecessary and wanton infliction of pain."  Gregg v. Georgia, 428 U.S. 153,

173 (1976); Sims v. Artuz, 230 F.3d 14, 20 (2d Cir. 2000).  To bring a claim of excessive

force under the Eighth Amendment, a plaintiff must establish both objective and subjective

elements.  Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999).

The objective element is "responsive to contemporary standards of decency" and

requires a showing that "the injury actually inflicted is sufficiently serious to warrant Eighth

Amendment protection."  Hudson, 503 U.S. at 9 (internal citations omitted); Blyden, 186

F.3d at 262.  However, "the malicious use of force to cause harm constitute[s] [an] Eighth

Amendment violation per se" regardless of the seriousness of the injuries.  Blyden, 186 F.3d

at 263 (citing Hudson, 503 U.S. at 9).  "The Eighth Amendment's prohibition of 'cruel and

unusual' punishments necessarily excludes from constitutional recognition de minimis uses

of physical force, provided that the use of force is not of a sort repugnant to the conscience

of mankind." Hudson, 503 U.S. at 9-10 (citations omitted). "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.'" Sims, 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." Id. at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" Id. (quoting Hudson, 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: "the extent of the injury and the mental state of the defendant[;] . . . the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." Scott v. Coughlin, 344 F.3d 282, 291 (2d Cir. 2003) (internal quotation marks and citations omitted).

Defendants first contend that Solar's injuries were insufficient to establish the objective prong of the analysis. Defendants' proffer that Solar had no injuries except for a raised area on his forehead when he was examined by medical personnel. Solar contends that the medical examination occurred prior to the use of force by Lennox. Solar claims that his medical issues included bloodshot eyes and extreme pain in his head from the blows that he received to the left side of his face. Within a week after the incident, medical records indicate repeated sick calls regarding the health of his eye. Approximately seven days after the alleged punches to the side of his face, Solar's medical records indicated a small bruise on the corner of Solar's eyes and ruptured membranes in the whites of his eyes. Solar

received multiple additional days of treatment and subjectively complained of pain and swelling in his eye.  Such injuries could be indicative of suffering multiple blows to the head. Moreover, such injuries resulting from the events as described by Solar could represent a per se constitutional violation.  See Baskerville v. Mulvaney, 411 F.3d 45, 48-49 (2d Cir. 2005).

The same defect is noted when evaluating the subjective prong of the analysis. Defendants' contend that Solar was constantly refusing the direct orders to keep his hands on the wall and eventually spun around in an aggressive manner which resulted in Lennox placing his hands on Solar's shoulders and forcing him against the wall.  Conversely, while not denying that he removed his hands from the wall, Solar contends that third part Rando interrogated him after being examined by the medical staff, essentially lying about Solar's medical condition, and then allowed Lennox to strike Solar in the head several times after Solar could not provide Rando with the information that he was seeking.  This competing evidence rests on each side on the credibility of Solar on the one hand and defendants on the other.  In these circumstances, the governing law that the evidence must be viewed in the light most favorable to the non-moving party leaves no choice but to credit Solar's version of events for purposes of this motion.  See In re Dana Corp., 574 F.3d 128, 152 (2d Cir. 2009) (holding that a court faced with a motion for summary judgment must draw all reasonable inferences in favor of the non-moving party and may not make credibility determinations or weigh the evidence, functions which are reserved to a jury and not a judge) (citing cases).

As described above, Solar's evidence would concede that he in fact failed to follow a direct order and repeatedly removed his hands from the wall.  However, Solar's evidence

would also establish that the medical examination was completed prior to the use of force and that the use of force was an unnecessary tactic implemented not to restore or maintain order, but to elicit information about a suspected inmate-on-inmate fight of which Solar had already denied knowledge.  Despite the relatively minor injuries Solar suffered, Lennox's actions in assaulting this inmate could constitute a per se constitutional violation.  Thus, viewing the facts in the light most favorable to Solar, he has proffered sufficient evidence to raise an issue of fact as to the objective prong of the Eighth Amendment analysis to require resolution by a jury.

Furthermore, if Solar's evidence is credited, Lennox's actions could be found wanton and malicious.  The need for force as a method to draw out information from inmates is unacceptable.  This conduct could be found unreasonable and unnecessary to sustain institutional order and safety.  Thus, such actions, as alleged by Solar, are more than sufficient as well to raise a question of material fact as to the subjective prong of the Eighth Amendment analysis.  Accordingly, defendants' motion for summary judgment should be denied on this ground as to Lennox.

## 2. Medical Care

"'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim.  Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003)(quoting Hudson, 503 U.S. at 9).  Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2)

33

whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." Brock v. Wright, 315 F.3d 158, 162-63 (2d Cir. 2003)(citing Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. Smith, 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998). Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Estelle v. Gamble, 429 U.S. 97, 104 (1976). "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate. Chance, 143 F.3d at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists . . . are not adequate grounds for a section 1983 claim." Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001).

In this case, Solar contends that defendants failed to provide him with appropriate medical care for his knee, shoulder, and back. Defendants do not dispute that Solar's knee condition, which required surgery, was a serious medical condition. Defs. Mem. of Law (Dkt. No. 98-2) at 8. However, defendants dispute the objective seriousness of Solar's knee and back injuries. Crediting Solar's repeated complaints of pain, in combination with the medical evidence supplied by both parties, such submissions may support a finding of extreme or chronic and substantial pain. Radiology results consistently found mild to moderate degenerative changes in Solar's back and shoulder. However, construing the

34

facts in the light most favorable to Solar, the aforementioned three prong test is satisfied. Solar was continually seeking medical attention for his chronic pain, these complaints caused Dr. Thompson to request further follow-up with an orthopaedist and prescribe Solar prescription pain medication, and they resulted in accommodations in at least some facilities for slings and housing, work, and recreation restrictions.

### a. Dr. Thompson

Dr. Thompson was involved in Solar's care while at Great Meadow. For all intents and purposes, as illustrated by Solar's deposition testimony, Solar does not have complaints with the care which Dr. Thompson provided. Moreover, pursuant to Solar's own testimony, the treatments which Dr. Thompson provided improved Solar's medical condition. Dr. Thompson saw and treated Solar on numerous occasions during his incarceration. Dr. Thompson referred Solar to the orthopaedist for both his knee and shoulder. Dr. Thompson issued various medical accommodations so that Solar could be fed in his cell, have lifting restrictions for work placement in the facility, receive assistive devices like his knee brace, and prescribe prescription medication for Solar's chronic pain. All of these actions show that Dr. Thompson provided professional, competent, and complete medical care.

Solar's only complaint with Dr. Thompson is that, after referring Solar back to the orthopaedist for a shoulder examination and having the request denied by the administrators in DOCCS, Dr. Thompson should have advocated more aggressively to have the decision appealed or overturned. However, physicians may have different ideas about the appropriateness of certain specialty treatments. Such disagreements between physicians does not equate to deliberate indifference. Douglas v. Stanwick, 93 F. Supp. 2d

35

320, 325 (W.D.N.Y. 2000) ("Not every physician will treat every ailment in exactly the same manner.  That does not mean that one of the physicians must be acting with deliberate indifference to the patient's needs.").  While the request was denied, that does not mean that Solar was subjected to deliberate indifference because he continued to receive treatment through Dr. Thompson, including medical appointments, a sling, and pain medication, to appropriately treat Solar's medical needs.  Moreover, the record indicates in multiple places the desire to have Solar attempt conservative therapies, such as physical therapy, to which Solar was averse.  Again, Solar was not entitled to receive the medical care or providers that he chose, but rather that course of treatment which was adequate to address his medical needs.  Chance, 143 F.3d at 703.  While Solar hoped that the outcome would be different, what remains is the fact that Dr. Thompson continually treated Solar appropriately and competently throughout his incarceration at Great Meadow.

Accordingly, defendants' motion on this ground should be granted.


### b.  Nesmith

Solar contends that Nesmith failed to provide him with appropriate medical care upon his admission to the infirmary on July 6, 2007 based upon Nesmith's suspicions that Solar was exhibiting manipulative behavior.

However, Solar's deposition testimony and the medical records demonstrate that medical staff quickly responded to Solar upon his fall, transferred him on to a back board, and brought him to the infirmary.  Once there, Solar was examined by Nesmith, who also sent Solar to obtain x-rays done of his back and offered him pain medication, which Solar refused.  Solar was admitted to the infirmary overnight and observed during his stay.

Moreover, Solar was discharged the following day when he exhibited no signs or symptoms of atypical ambulation.  The radiology results from Solar's back showed no appreciable changes from prior x-rays and illustrated the same, mild, degenerative joint changes which were seen prior.

To the extent that Solar contends that Nesmith's assessment and diagnosis of Solar was incorrect, such contentions are meritless as they amount to a disagreement over treatment which is insufficient to state an Eighth Amendment claim.  Chance, 143 F.3d at 703.  The same is true for disagreements over the prescribed course of treatment, including an x-ray, observation, and then discharge from the infirmary.  Sonds, 151 F. Supp. 2d at 312.  The record is replete with evidence that Nesmith responded, evaluated, and treated Solar, contradicting any claims of deliberate indifference.

Accordingly, defendants' motion on this ground should be granted.


### c. Tichenor

Solar's complaints against Tichenor stem from the fact that her evaluation and prescribed treatment of Solar's medical needs differed from that of Dr. Thompson.  After evaluating Solar and reviewing his medical record, Tichenor terminated Solar's prescription medication and certain of his medical accommodations.  Much as with defendant Nesmith, such contentions are insufficient as they amount to nothing more than a disagreement over the treatment which Solar received.  Sonds, 151 F. Supp. 2d at 312.  While the course of treatment was different than that which was proposed by Dr. Thompson, it did not automatically mean that it was inadequate or unconstitutional as medical professionals are free to make their own treatment decisions about their patients.  Douglas, 93 F. Supp. 2d at

325.  Tichenor's medical notes indicate that she thoroughly examined Solar and his medical history.  Moreover, Tichenor's decisions also include sound rationales, which was also included in the notes, as to why Solar no longer required the medication or accommodations.

Accordingly, defendants' motion on this ground should be granted.

### d. Other Facilities/Inconsistent Medical Treatment

As previously discussed, Solar's overall claim about the variations in his medical treatment among facilities is also insufficient to state an Eighth Amendment violation.  Medical professions can, and will, differ in their professional opinions about the method and mode of medical treatment.  Douglas, 93 F. Supp. 2d at 325.  Such inconsistency does not demonstrate deliberate indifference.  Id.  Instead, the main question to be posed is whether the medical treatment that was received was adequate.  Chance, 143 F.3d at 703.  A review of the extensive testimony and medical documents provided by both parties indicate that Solar received adequate treatment for his degenerative joint and back disease.  Solar was consistently seen and examined by medical professionals.  Solar was given a multitude of radiology reports, specialist referrals, medical accommodations, and medication to assist with the management of his symptoms, primarily pain.  Accordingly, defendants' motion on this ground should be granted.

### 3.  Meals

The Eighth Amendment "require[s] that prisoners be served nutritionally adequate

food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." Robles v. Coughlin, 725 F.2d 12, 15 (2d Cir. 1983). "While no court has held that denial of food is a per se violation of a prisoner's Eighth Amendment rights, under certain circumstances a substantial deprivation . . . may well be recognized as being of constitutional dimension." Id. (citations omitted). However, the deprivation must be sufficient to create a serious danger to the health of the inmate. See, e.g., Beckford v. Portuondo, 151 F. Supp. 2d 204, 213 (N.D.N.Y. 2001) (finding deprivation of two of three meals per day for eight days created an issue of material fact sufficient for Eighth Amendment claim to survive summary judgment); Moss v. Ward, 450 F. Supp. 591, 596–597 (W.D.N.Y. 1978) (finding denial of food for four consecutive days and reduced food for three days thereafter sufficient to violate prisoner's Eighth Amendment rights). However, the scope of the deprivation of food required to constitute cruel and unusual punishment is significantly greater than the deprivation present here. Missing a single meal on three separate occasions throughout the course of twenty-five days, or of approximately seventy consecutive meals, represents a de minimus injury which did not deny Solar the minimal civilized measure of life's necessities. While no doubt this was more than likely unpleasant, it is insufficient to establish an Eighth Amendment claim.[8]   Accordingly, defendants' motion on this ground should be granted.

## F. Qualified Immunity

Defendants claim that even if Solar's constitutional claims are substantiated, they are

---

[8] It is also noteworthy that Solar testified that after complaining to Rowe about missing these meals, the problem stopped.  Solar Dep. at 94.

entitled to qualified immunity.  Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982); <u>Aiken v. Nixon</u>, 236 F. Supp. 2d 211, 229-30 (N.D.N.Y. 2002) (McAvoy, J.), <u>aff'd</u>, 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003).  However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified . . . immunity might still be available . . . if it was objectively reasonable for the public official to believe that his acts did not violate those rights." <u>Kaminsky v. Rosenblum</u>, 929 F.2d 922, 925 (2d Cir. 1991); <u>Magnotti v. Kuntz</u>, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation.  <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001).  Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. <u>Aiken</u>, 236 F. Supp. 2d at 230.  Here, the second prong of the inquiry need only be addressed with regard to Solar's excessive force claim against Lennox.  The second prong need not be addressed with respect to his other claims because, as discussed <u>supra</u>, it has not been shown that defendants violated Solar's constitutional rights.

There is no question that it was well settled on June 26, 2008 that the Eighth Amendment (1) prohibited a corrections officer from assaulting or intentionally inflicting harm on an inmate (<u>Hudson</u>, 503 U.S. at 9-10), and (2) required that inmates are to be provided "with . . . reasonable safety [as i]t is cruel and unusual punishment to hold convicted criminals in unsafe conditions," (<u>Helling</u>, 509 U.S. 33 (internal quotation marks

and citations omitted)) whether that pertain to their medical care, conditions of confinement, or expectation for protection from corrections staff against the use of excessive force. Thus, accepting all of Solar's allegations as true, qualified immunity cannot be granted to Lennox for the alleged use of force.  However, defendants' motion should be granted in the alternative on this ground as to all other defendants, for all other claims.

## III.  Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 98) be **GRANTED** as to all defendants and all claims.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated:  July 16, 2012
        Albany, New York            _____
                                    United States Magistrate Judge